**Jane R. MUNROE, etc., Plaintiff,**

v.

**BARR LABORATORIES,
INC., Defendant.**

**Case No. 4:07cv395–RH/WCS.**

United States District Court,
N.D. Florida,
Tallahassee Division.

Oct. 15, 2009.

Peter Lawrence Kaufman, Levin Papantonio, Pensacola, FL, for Plaintiff.

Jeffrey Daniel Geoppinger, Joseph P. Thomas, Jeffrey Francis Peck, Ulmer & Berne LLP, Cincinnati, OH, Daniel J. Gerber, Rumberger Kirk & Caldwell, Orlando, FL, for Defendant.

## *ORDER DENYING MOTION FOR SUMMARY JUDGMENT*

ROBERT L. HINKLE, District Judge.

This is a wrongful-death failure-to-warn case involving a generic version of the prescription drug Adderall. The defendant has moved to dismiss based on federal preemption and for summary judgment on additional grounds. This order denies the motions.

### I

Dr. Melody Agbunag, a psychiatrist, diagnosed Kristina Flatt with attention deficit hyperactivity disorder. Dr. Agbunag wrote a series of prescriptions for Adderall. Ms. Flatt filled the prescriptions with generic Adderall manufactured by the defendant Barr Laboratories, Inc. Whether she took the drug as prescribed or took excessive amounts to lose weight is disputed.

On October 22, 2005, more than two years after she began taking generic Adderall, Ms. Flatt felt ill, sat down in a chair, and lost consciousness. Efforts to revive her were unsuccessful. Within an hour she was dead.

The associate medical examiner—a board-certified forensic pathologist—conducted an autopsy and concluded that Ms. Flatt died from "[a]cute fatal cardiac dysrhythmia without pulse, [d]ue to toxic effects of amphetamine and two other drugs." Autopsy Report (document 71–20) at 1. Generic Adderall is an amphetamine. The other drugs were pseudoephedrine and diphenyadramine. *Id.* At the time of her death, Ms. Flatt was taking not only generic Adderall but also Sudafed, the apparent source of the other drugs.

### II

The personal representative of Ms. Flatt's estate is her mother, Jane R. Munroe. Ms. Munroe asserts that Barr failed to provide adequate warnings that first, generic Adderall taken in prescribed doses could cause cardiac arrhythmia and sudden cardiac death, and second, that taking the drug in combination with pseudoephedrine increased the risk. Ms. Munroe seeks to recover under Florida common-law theories of negligent failure to warn and strict-liability failure to warn. She asserted other claims—that the drug itself was defective separate and apart from any failure to warn and that the failure to disclose the risks constituted fraud—but she has abandoned those claims. And she has admitted

that if Ms. Flatt took more than the prescribed dose, Barr is not liable, because Dr. Agbunag knew of the risk that an overdose would cause sudden cardiac death; a further warning by Barr would have made no difference.

Barr has moved to dismiss on the ground that federal law preempts a state-law failure-to-warn claim against the manufacturer of a generic drug. Section III of this order addresses this contention.

Barr has moved for summary judgment on the grounds that (a) generic Adderall, when taken in prescribed doses, does not increase the risk of sudden cardiac death above the background rate in the general population, (b) Ms. Flatt's physician, Dr. Agbunag, was an adequately-warned learned intermediary whose involvement blocks any claim that Barr failed to adequately warn Ms. Flatt herself, (c) an explicit warning of the kind Ms. Munroe says should have been given would not have changed Dr. Agbunag's prescription of the drug or her advice to Ms. Flatt and thus would not have prevented Ms. Flatt's death, and (d) an explicit warning would not have changed the outcome, even if it had reached Ms. Flatt herself, because she would not have heeded the warning. Section IV of this order addresses these contentions.

### III

In *Wyeth v. Levine*, —— U.S. ——, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), the Court held that federal law does not preempt a state-law failure-to-warn claim against the manufacturer of a branded drug. Barr says generic drugs are different because the manufacturer of a branded drug may change its label unilaterally while seeking the Federal Drug Administration's approval of the change. Barr asserts that a generic manufacturer, in contrast, must produce the same drug and use the same label—that is, give the same warnings—as the branded drug manufacturer, with limited exceptions not applicable here.

■ District courts applying *Levine* to generic drugs have come down on both sides of the issue. *Compare Bartlett v. Mutual Pharm. Co.*, 659 F.Supp.2d 279 (D.N.H.2009) (thoroughly analyzing the issue and holding that a state-law failure-to-warn claim against a generic manufacturer is *not* preempted); *Stacel v. Teva Pharm., USA*, 620 F.Supp.2d 899, 906 (N.D.Ill. 2009) (holding a claim *not* preempted); *Schrock v. Wyeth, Inc.*, 601 F.Supp.2d 1262 (W.D.Okla.2009) (same); *and Kellogg v. Wyeth*, 612 F.Supp.2d 437 (D.Vt.2009) (same) *with Mensing v. Wyeth, Inc.*, 562 F.Supp.2d 1056 (D.Minn.2008) (holding that a state-law failure-to-warn claim against a generic manufacturer *is* preempted) *and Morris v. Wyeth, Inc.*, 642 F.Supp.2d 677 (W.D.Ky.2009) (same). The courts that have held claims not preempted have the better of the arguments. No purpose would be served by again plowing the same ground in this opinion.

Two points, though, deserves mention. First, Barr's assertion that it is impossible for a generic-drug manufacturer to comply with both the federal law requiring an FDA-approved label and any state law requiring an additional warning is incorrect. Under 21 C.F.R. §§ 314.70, .97, a drug manufacturer may strengthen its label while seeking FDA approval of the change. As noted in *Bartlett* and other cases, this procedure is not limited to brand manufacturers; a generic manufacturer can invoke the procedure, too. *See Bartlett*, 659 F.Supp.2d at 292–93; *Stacel*, 620 F.Supp.2d at 906–07; *see also Foster v. Am. Home Prods. Corp.*, 29 F.3d 165, 170 (4th Cir.1994) (citing § 314.70 and concluding: "Although generic manufacturers must include the same labeling information

as the equivalent name brand drug, they are also permitted to add or strengthen warnings and delete misleading statements on labels, even without prior FDA approval."). Because generic manufacturers, like brand manufacturers, can invoke § 314.70 to strengthen their warnings, *Levine* is fully applicable to generic manufacturers.

Second, neither federal law nor state law requires a manufacturer to sell a generic drug at all. If the manufacturer chooses to do so—as Barr did here—it gains the ability to sell a drug without incurring the substantial cost of developing it and obtaining the initial regulatory approval. But the generic manufacturer enters the market subject to the same product-liability risk as the brand manufacturer. So if it turns out a drug is unsafe—that is, defective—the generic manufacturer is not exempt from the same liability faced by the brand manufacturer. And if it turns out the label is inadequate, the generic manufacturer again is not exempt from the same liability faced by the brand manufacturer. *See Foster,* 29 F.3d at 169–70. In short, the generic manufacturer rides the brand manufacturer's coattails—in the right to sell the drug at all, in exposure for any failure to design the drug properly, and—if it adopts the brand manufacturer's warnings without change—in exposure for failing to adequately warn of the drug's risks. *See id.*

Any other application of *Levine* would make no sense. Federal law allows a generic manufacturer to go toe-to-toe with the brand manufacturer in selling the drug. Nothing in federal law, however, suggests that a generic manufacturer should be exempt from the same liability that the brand manufacturer faces for any design defect or failure to warn. There is simply no good basis for giving the generic manufacturer an unfair competitive advantage in this respect. Ms. Munroe's state-law failure-to-warn claims are not preempted.

## IV

On Barr's motion for summary judgment, genuinely disputed factual issues must be resolved—and all reasonable inferences from the evidence must be drawn—in favor of Ms. Munroe as the nonmoving party. But Ms. Munroe, as the party who will have the burden of proof at trial, bears the burden of producing evidence in response to the summary-judgment motion that would be sufficient to support a verdict in her favor.

## A

In a product-liability case involving a drug, a plaintiff ordinarily has the burden of establishing both general and individual causation. *See, e.g., McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1239 (11th Cir.2005). General causation is the connection between the drug and injuries of the kind at issue. Individual causation—sometimes called specific causation—is the connection between the drug and the injury that the individual plaintiff actually sustained.

In this case, therefore, Ms. Munroe has the burden of establishing that generic Adderall, either alone or when taken in combination with pseudoephedrine, increases the risk of sudden cardiac death above the background rate that exists in the general population, and that the drug was a cause of Ms. Flatt's death. Ms. Munroe has proffered the medical examiner's opinion and other expert testimony on these questions, but Barr says this evidence is insufficiently reliable to be admissible. Barr says Ms. Munroe has failed to carry the burden.

At one level the contention is easily rejected. Generic Adderall is an amphet-

amine. Amphetamines can cause arrhythmia and sudden cardiac death. Generic Adderall is no different from any other amphetamine in this respect. Ms. Flatt took the drug and died. After ruling out other possible causes of death, the medical examiner concluded that the toxic effects of amphetamine, together with pseudoephedrine and diphenyadramine, caused the death. As a matter of plain common sense—that is, reasonable inferences from the evidence—one could easily conclude that the generic Adderall was a cause of the death.

Barr's contention, though, is more nuanced. Barr says that even if enough Adderall can cause arrhythmia and sudden cardiac death, there is no evidence that Adderall *in prescribed doses* can have this effect, even in combination with pseudoephedrine. Barr says that in order to carry the burden of showing general causation, Ms. Munroe must show not just that *enough* Adderall can cause sudden cardiac death, but that Adderall *in prescribed doses* can do so. Ms. Munroe responds that the general-causation requirement does not go this far—that a plaintiff need only show that *the drug* causes injuries of the relevant kind, not necessarily that *the dose* causes such injuries. *McClain* did not squarely present this issue, but its discussion of general causation, *see* 401 F.3d at 1239, was consistent with Ms. Munroe's position.

This is what the professors might call a "nice question." But it is one that need not be resolved at this stage of this case.

The amount of amphetamine in Ms. Flatt's system—as measured in postmortem blood from a femoral artery—exceeded by a substantial margin the amount that a prescribed dose would produce without accumulations resulting from earlier doses. Both sides' experts agree on this. A possible explanation is that Ms. Flatt took more generic Adderall than the prescribed dose. There is evidence that would support this conclusion. But there is also evidence from which a reasonable juror could find that Ms. Flatt did not exceed the prescribed dose. The date when she last filled her prescription is known. If she had taken the prescribed dose from that date until the date of death, she would have had 21 pills left. Ms. Flatt's sister says she found Ms. Flatt's pill bottle after her death and that it contained 21 pills. The sister explains her inability to produce the pills by saying she later took them herself.

Accepting this testimony as true, a reasonable juror could find that Ms. Flatt took the prescribed dose of generic Adderall but had a greater level of amphetamine in her blood than the prescribed dose would have produced without accumulations in her body over time. Barr says there is no reliable evidence that this can happen—but the evidence is sufficient to support a conclusion that in this case it *did* happen. And reaching the conclusion does not depend on unreliable science. To the contrary, the conclusion derives from the lay testimony (which of course must be accepted as true for summary-judgment purposes), the accepted science of measuring the amount of the drug in the postmortem blood sample, and the unremarkable scientific conclusion that postmortem blood does not include a greater percentage of the drug than was included in the blood before death—unless the additional drug leeched out of other body parts. If the drug leeched out of other body parts, it confirms—or at least would support a finding—that there was an accumulation of the drug in the body, precisely as Ms. Munroe asserts. Even Barr's own expert testified that it was "certainly a possibility" that the level of amphetamine actually found in Ms.

Flatt's blood caused her death. Barbieri dep. at 19 (document 79–2 at 36 of 111).

None of this means that generic Adderall was a cause of Ms. Flatt's death. It does mean that this is not an issue than can be resolved on summary judgment.

To be sure, that a drug caused a death does not mean that the manufacturer should have warned of the possibility. Information sufficient to give rise to a duty to warn, on the one hand, and information sufficient to establish general causation, on the other hand, are overlapping—but not always coextensive—categories. Barr's summary-judgment motion asserts that Ms. Munroe failed to submit evidence from which a juror could find that generic Adderall was a cause of Ms. Flatt's death. That is incorrect, as set forth above. Barr's motion did not make the distinct argument that even if generic Adderall was a cause of Ms. Flatt's death, the information available to Barr at the time was not sufficient to give rise to a duty to warn of this risk. At the summary-judgment stage, such a contention would not likely have succeeded.

### B

■ Under Florida law, a drug manufacturer has a duty to provide adequate warnings to the "learned intermediary"—ordinarily the physician—who will prescribe the drug. *See, e.g., Felix v. Hoffmann–LaRoche, Inc.,* 540 So.2d 102, 104–05 (Fla.1989). The manufacturer ordinarily has no separate duty to warn the *patient.*

■ Barr provided warnings about generic Adderall through the FDA-approved label. The label in effect at the times at issue said that an *overdose* could cause arrhythmia and circulatory collapse. But the label gave no indication that an *approved* dose could have these results.

There was no warning that an approved dose could lead to arrhythmia or sudden cardiac death or that an approved dose in combination with pseudoephedrine or a similar drug could have this effect.

Barr says, though, that Ms. Flatt's physician Dr. Agbunag knew these things. Barr cites Dr. Agbunag's deposition as support for the assertion. But Dr. Agbunag did not say this. She said, in effect, that she knew what was on the label: that an overdose (or "misuse") could cause arrhythmia or sudden cardiac death. *See* Agbunag dep. at 32–33, 151–53 (document 79–3 at 77–78, 95–97).

The learned-intermediary doctrine does not entitle Barr to summary judgment.

### C

■ Barr also says that a better warning to Dr. Agbunag would not have changed her decision to prescribe generic Adderall or her own warnings and instructions to Ms. Flatt. On this record, a juror reasonably could agree. But a reasonable juror also could disagree. A juror could reasonably infer that if a physician was told that generic Adderall, in combination with pseudoephedrine, could kill an otherwise healthy adult, the physician would so advise a patient, far more explicitly than Dr. Agbunag advised Ms. Flatt.

### D

■ Finally, Barr says that Ms. Flatt ignored a number of warnings. She smoked, for example, and drank coffee despite Dr. Agbunag's warning that she should not do so while taking Adderall. Barr says Ms. Flatt would have ignored any warning about arrhythmia, sudden cardiac death, or using pseudoephedrine while taking Adderall.

A reasonable juror could agree. But a reasonable juror also could disagree.

Smoking is an addiction, and Ms. Flatt was trying to quit. Coffee is coffee—a product that is used daily by millions including many who are passionate about it, that is generally regarded as safe, and that is not commonly regarded as a drug. A stern warning about the potentially deadly combination of Adderall and another drug might produce a different result. Or so a reasonable juror could conclude.

## V

The disputes in this case are the stuff of which jury trials are made. Accordingly,

IT IS ORDERED:

The defendant's motion to dismiss (document 54) and motion for summary judgment (document 68) are DENIED.